**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **GREGORY L. BABB,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **No. 07-CV-24-TCK-SAJ** |
| | ) | |
| **NORMA EAGLETON,** | ) | |
| **EAGLETON, EAGLETON &** | ) | |
| **HARRISON, Inc.,** | ) | |
| **CHARLES F. MCGOWEN,** | ) | |
| **JENNIFER D. JONES,** | ) | |
| **MARK JONES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**OPINION AND ORDER**

Before the Court is the Motion to Dismiss of Defendant Charles McGowen (Doc. 25), which the Court converted to a motion for summary judgment, and the Motion for Summary Judgment of Defendants Norma Eagleton and Eagleton, Eagleton, & Harrison, Inc. (Doc. 72).

**I.     Factual Background**

Plaintiff Gregory L. Babb  ("Father") and Defendant Jennifer Jones ("Mother") are the natural parents of twin boys ("Minor Children").  Father and Mother are divorced, and Mother is remarried to Defendant Mark Jones ("Stepfather").  On November 25, 2002, the Honorable Terry Bitting ("Judge Bitting") approved a Joint Custody Plan and appointed a Parenting Coordinator in Father and Mother's divorce proceeding, Case No. FD 97-4248 ("Domestic Case").  In mid-late 2005 and continuing through early 2006, Mother intercepted and recorded telephone conversations between Father and Minor Children by setting up a recording device on her home telephone.  Mother allegedly disclosed the contents of the intercepted communications to the attorney representing her in the Domestic Case, Defendant Norma Eagleton ("Eagleton") of the law firm of Eagleton,

Eagleton, & Harris ("Law Firm").  Mother also allegedly disclosed the contents of the intercepted communications to the appointed Parenting Coordinator in the Domestic Case, Defendant Charles McGowen ("McGowen" or "Parenting Coordinator").

On January 9, 2007, Father filed the instant lawsuit against Mother, Stepfather, Eagleton, Law Firm, and McGowen, alleging that each Defendant violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520 ("Title III").[1]  In Counts I and II, Father alleges that Mother and Stepfather violated Title III by intercepting, using, and disclosing the intercepted conversations, in violation of 18 U.S.C. §§ 2511(1)(a), (c), and (d).  In Count III, Father alleges that Attorney violated Title III by using and disclosing the contents of the intercepted communications in preparation for and during a hearing held before Judge Bitting in the Domestic Case, in violation of § 2511(1)(c) and (d).  In Count IV, Father alleges that Law Firm is liable for the acts of Attorney because Attorney was acting in the scope of her employment at the time of the

---

[1]  The relevant liability provisions of Title III state:

(1) Except as otherwise specifically provided in this chapter any person who--
(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
. . .
(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;
(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or
. . .
shall be punished in subsection (4) or shall be subject to suit as provided in subsection (5).

18 U.S.C. § 2511(1).

-2-

alleged violations.  In Count V, Father alleges McGowen violated Title III by using and disclosing the contents of the intercepted communications, in violation of § 2511(1)(c) and (d).

By Opinion and Order dated November 5, 2007 ("11/5/07 Order"), the Court ruled on then-pending dispositive motions.  The Court denied Mother and Stepfather's motion to dismiss, ruling that:  (1) Mother and Stepfather were not entitled to parental immunity because it was Father, rather than Minor Children, suing under Title III; (2) Father had alleged facts precluding a dismissal based on the Extension Phone Exemption; and (3) Father had alleged facts precluding a dismissal based on the Consent Exception.[2]  The Court denied Eagleton and Law Firm's motion to dismiss, ruling that:  (1) Eagleton was not entitled to a "litigation privilege" defense because such privilege, as articulated by Eagleton in her briefs, arose exclusively under state defamation law; and (2) Eagleton was not protected from liability by virtue of Oklahoma's professional corporation statutes.

Because evidence was presented outside the pleadings, the Court converted McGowen's motion to dismiss to one for summary judgment.  The Court lifted a stay of discovery against McGowen, which was based solely on the doctrine of quasi-judicial immunity.  The Court did so because such immunity depended, at least to some extent, on whether McGowen exceeded the scope of his appointment in allegedly using and disclosing the recorded communications, and the Court determined that limited discovery against McGowen was appropriate to resolve this issue.  Following the Court's 11/5/07 Order, McGowen filed a second motion for protective order preventing discovery against McGowen.  This time, the motion for protective order was based on specific language in the order appointing McGowen as Parenting Coordinator ("Appointment Order") in the Domestic Case.  Father contended that the Appointment Order had terminated and

---

[2]     For explanation of these terms, see 11/5/07 Order.

that discovery protections extended to McGowen therein were no longer in effect. The motion for protective order was referred to Magistrate Judge Sam Joyner ("Judge Joyner"). Ultimately, the Court affirmed Judge Joyner's decision that the Appointment Order's discovery protections remained in effect. (*See* 1/31/08 Order, Doc. 71.) However, in the interest of fairness and for the purpose of fully prosecuting his claims in this case, the Court gave Father the opportunity to seek discovery from a state-court judicial officer, in accordance with the terms of the Appointment Order. (*Id.* 9.) The Court stated its intent that "discovery be allowed against McGowen on the scope of appointment question unless there is an overriding reason to rule otherwise." (*Id.*) The Court further opined that the state court was "in the best position to determine whether or not such overriding reason or concern exists." (*Id.*) The Court granted the parties until April 25, 2008 to submit supplemental briefs and supplemental evidence regarding McGowen's motion for summary judgment.

On April 8, 2008, after holding a hearing, the Honorable Kirsten Pace ("Judge Pace"), denied Father's request for discovery against McGowen. Judge Pace concluded:

> The current requests for discovery of McGowen are not limited in time, scope, or context. They are not specific discovery requests as referenced in the Appointment Order. . . . The domestic case is pending. This Court is most concerned with resolving the current Motion to Modify. No proposal has been made by [Plaintiff] to explain how information requested for the purpose of litigating the Federal case would not be used or usable by the parties or counsel in the state court action currently pending and impacting the children still at issue. There is no stipulation or other indication from current counsel in the [Domestic Case] that they would not utilize any McGowen-discovery requested or be concerned about their trial judge's involvement in collateral rulings about discovery sought for the purpose of litigating another case between the same parties. McGowen did submit limited discovery responses in the Federal action. This Court is concerned that allowing the broad discovery requested would deter the proper functioning and intent of the Parenting Coordinator Act. The Court thus specifically finds it is more important to preserve the immunity granted McGowen than to allow [Father's] unspecified discovery under the set of facts presented.

-4-

(4/8/08 Order on Mot. for Leave 4-5, Ex. 1 to McGowen's Supp. Br.)  Thus, Judge Pace determined

that Father's discovery requests were not sufficiently specific and that there existed overriding

reasons to prevent discovery against McGowen.

On the dispositive motion deadline, Eagleton and Law Firm filed a motion for summary

judgment, arguing, *inter alia*, that Eagleton did not have knowledge of the intercepted

communications at the time of her alleged "use" and "disclosure" of the intercepted communications

and therefore could not be liable for any Title III violations.  As directed by the Court, Father and

McGowen submitted supplemental briefs regarding McGowen's motion for summary judgment.

Mother and Stepfather did not file a motion for summary judgment.

## II.      Summary Judgment Standard

Summary judgment is proper only if "there is no genuine issue as to any material fact, and

the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving

party bears the burden of showing that no genuine issue of material fact exists.  *See Zamora v. Elite*

*Logistics, Inc.*, 449 F.3d 1106, 1112 (10th Cir. 2006) (citation omitted).  The Court resolves all

factual disputes and draws all reasonable inferences in favor of the non-moving party.  *Id.* (citation

omitted).  However, the party seeking to overcome a motion for summary judgment may not "rest

on mere allegations" in his complaint but must "set forth specific facts showing that there is a

genuine issue for trial."  Fed. R. Civ. P. 56(e).

## III.     McGowen's Motion for Summary Judgment

Father claims that McGowen "disseminated and used the contents of the intercepted

communications by referencing them and their content in correspondence to the attorneys for the

parties and the parties, themselves."  (Compl. ¶ 47.)  Specifically, Father claims that McGowen's

statements in a letter dated June 5, 2006 letter ("6/5/06 Letter") demonstrated his use and disclosure of the allegedly wiretapped communications. McGowen defends this claim by arguing that, even assuming he wrongfully used and disclosed the recorded conversations, he did so in his role as Parenting Coordinator and is therefore entitled to quasi-judicial immunity. Alternatively, McGowen argues that his actions did not constitute violations of Title III.[3] In response, Father argues that quasi-judicial immunity does not shield McGowen from liability because (1) judicial immunity can never serve as a defense to Title III liability, as the only defenses to Title III are those listed in the statute, and (2) assuming judicial immunity is a defense to Title III, McGowen does not qualify for such defense because he was acting outside the scope of his appointment as Parenting Coordinator at the time of the alleged violations.

### A.    Quasi-Judicial Immunity - Defense to Title III Liability

First, the Court must address whether quasi-judicial absolute immunity is a defense to a Title III claim, which presents a question of first impression in the Tenth Circuit. Father argues that the only defenses to a Title III claim are those listed in the statute, *see, e.g.*, 18 U.S.C. § 2511(2)(a)-(i) (setting forth specific exceptions to Title III liability), and that the Court may not apply any defenses existing solely at common law, such as quasi-judicial immunity.

The Court concludes that quasi-judicial absolute immunity is a defense to Title III liability, notwithstanding the fact that it is not listed as a specific statutory exception in the text of Title III. In the context of prosecutors performing quasi-judicial functions, federal courts have indicated that

---

[3]    McGowen admits that Mother provided him "with what purports to be a summary of the contents of one or more tapes" but denies that he ever listened to the tapes or "used or disseminated" the contents of the tapes in any manner. Because the Court finds McGowen's actions to be covered by quasi-judicial immunity, the Court does not reach the question of whether his actions potentially violated Title III.

quasi-judicial immunity can serve as a defense to a Title III claim.  For example, in *Jacobsen v. Bell Telephone Company of Nevada*, 592 F.2d 515, 524 (9th Cir. 1976), the Ninth Circuit affirmed a district court's decision that certain county officials did not "enjoy the quasi-judicial immunity against suit afforded prosecutors performing quasi-judicial functions."  Although the court rejected the defense in that case, the court indicated that judicial immunity potentially could serve as a defense to Title III liability.  In *Forsyth v. Kleinienst*, 599 F.2d 1203, 1215 (3d Cir. 1979), the court held, for purposes of a claim arising under 42 U.S.C. § 1983, that "warrantless electronic surveillance is protected by the shield of absolute immunity when it is made in the context of a quasi-judicial function."  *Id.*  In a footnote, the court indicated that such a defense, if it applied to the facts, could also serve as a defense to plaintiff's statutory claims arising under Title III.  *See id.* at 1215 n.16; *see also Bansal v. Russ*, 513 F. Supp. 2d 264, 275 (E.D. Pa. 2007) (addressing quasi-judicial immunity as defense to Title III liability and stating that United States Attorney's conduct would be absolutely immune if the securing of information was necessary to a prosecutor's decision to initiate a criminal prosecution).  Although these cases arose in the context of quasi-judicial immunity extended to prosecutors, the reasoning in such cases extends equally to other types of individuals serving in quasi-judicial roles.

In addition, there is authority holding that qualified immunity extended to government actors is a defense to Title III liability.  *See Tapley v. Collins*, 211 F.3d 1210, 1216 (11th Cir. 2000) (holding that "the qualified immunity defense is so well-rooted in our jurisprudence that only a specific and unequivocal statement of Congress can abolish the defense" and that Title III "lacks the specific, unequivocal language necessary to abrogate the qualified immunity defense"); *Blake v. Wright*, 179 F.3d 1003, 1012 (6th Cir. 1999) ("Thus, we conclude that Congress did not intend to

deprive public officials of their defense of qualified immunity when it enacted Title III."). *But see Berry v. Funk*, 146 F.3d 1003, 1013 (D.C. Cir. 1998) ("[T]he qualified immunity doctrine applied to constitutional torts and § 1983 claims has no application to [the plaintiff's] statutory [Title III] claims. . . . When Congress itself provides for a defense to its own cause of action, it is hardly open to the federal court to graft common law defenses on top of those Congress creates.")[4]  In reaching its conclusion regarding qualified immunity, the Sixth Circuit reasoned: "We would not strip a judge or prosecutor of absolute immunity because the claim related to a statutory violation and the statute provided an affirmative defense." *Blake*, 179 F.3d at 1012; *see also Tapley*, 211 F.3d at 1216 (quoting *Blake*'s reasoning that judges or prosecutors are not stripped of absolute judicial immunity simply because Congress failed to codify such defense).  These qualified immunity cases accept as an established legal premise that a judicial officer would not be stripped of his or her immunity from a federal statutory violation simply because the statute also provided certain affirmative defenses. In addition, judicial immunity, even more so than qualified immunity, is well-rooted in federal jurisprudence. *See Forrester v. White*, 484 U.S. 219, 225-26 (1988) (setting forth history of judicial immunity and stating that "judges have long enjoyed a comparatively sweeping form of immunity" and that the Supreme Court has "not been quick to find that federal legislation was meant to diminish the traditional common-law protections extended to the judicial process").  Accordingly,

---

[4]     The Tenth Circuit has not directly weighed in on the question of whether qualified immunity is a defense to Title III.  In the case of *Davis v. Gracey*, 111 F.3d 1472, 1481-85 (10th Cir. 1997), the court addressed separately the issues of whether officers were entitled to qualified immunity from § 1983 liability and whether officers qualified for a statutory defense to Title III liability.  This led the Sixth Circuit to classify the Tenth Circuit as having "implied" that statutory defenses and qualified immunity are "separate defenses." *See Blake*, 179 F.3d at 1011. However, the Court does not interpret *Davis* to hold or imply that federal common-law immunity doctrines are not defenses to Title III claims.

the weight of authority, as well as the traditional protections extended to the judicial process, persuade the Court that Congress did not intend to abrogate judicial immunity or quasi-judicial immunity as defenses to Title III liability.

**B.      Quasi-Judicial Immunity - Applied to McGowen's Actions**

Federal case law explains that quasi-judicial immunity is a form of "absolute" immunity that attaches "when a public official's role is 'functionally comparable' to that of a judge.'" *Hamilton v. Leavy*, 322 F.3d 776, 785 (3d Cir. 2003). McGowen is entitled to quasi-judicial immunity if (1) his role is functionally comparable to that of a judge, or (2) his acts are integrally related to an ongoing judicial proceeding. *See Mitchell v. Fishbein*, 377 F.3d 157, 172 (2d Cir. 2004) (citing *Butz v. Economou*, 438 U.S. 478, 513 (1978) and *Scotto v. Almenas*, 143 F.3d 105, 111-12 (2d Cir. 1998)).[5] In determining whether a role is functionally comparable to that of a judge, a court must evaluate several factors: "'[1] the need to assure that the individual can perform his functions without harassment or intimidation; [2] the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; [3] insulation from political influence; [4] the importance of precedent; [5] the adversary nature of the process; and [6] the correctability of error on appeal.'" *Id.* at 172-73 (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 201-02 (1985)). In determining whether the actions at issue are "integrally related to an ongoing judicial

---

[5]   The Court has utilized federal case law to determine whether McGowen is entitled to quasi-judicial immunity. This is because the Tenth Circuit has indicated that state laws or policies are not defenses to a Title III claim. *See Heggy v. Heggy*, 944 F.2d 1537, 1541 n.8 (10th Cir. 1991). The Court notes, however, that the test for applying quasi-judicial immunity under federal law is similar if not identical to the Oklahoma test. *See Hathcock v. Barnes*, 25 P.3d 295, 297 (Okla. Civ. App. 2001) (holding that a psychologist appointed by the court to assist in making a custody determination was immune from suit because the psychologist was performing a "function integral to the judicial process").

proceeding," the official must be engaged in acts that are "integrally related not simply to the judicial process in general but to a concrete judicial case or controversy." *Id.* at 174. Notwithstanding these general rules, "[a]bsolute immunity fails to attach to judicial officers [if] they act clearly and completely outside the scope of their jurisdiction." *Demoran v. Witt*, 781 F.2d 155, 158 (9th Cir. 1986); *Ward v. San Diego County Dep't of Social Servs.*, 691 F. Supp. 238, 240 n.1 (S.D. Cal. 1988). In addition, it must be remembered that "immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches." *Forrester v. White*, 484 U.S. 219, 227 (1988).

The Court concludes that McGowen is entitled to the defense of quasi-judicial immunity, as recognized under federal law, because his role as Parenting Coordinator was functionally comparable to that of a judicial officer. By agreement of the parties and order of court, McGowen was appointed as Parenting Coordinator in the Domestic Case, to serve for a period of five years. Pursuant to the Parenting Coordinator Act ("PCA"), Okla. Stat. tit. 43, §§ 120.1-120.6, a parenting coordinator is "an impartial third party . . . appointed by the court to assist parties in resolving issues and deciding disputed issues . . . relating to parenting and other family issues in any action for dissolution of marriage . . . where a minor child is involved." *Id.* § 120.2(1). Under the PCA, the "parties may limit the decision-making authority of the parenting coordinator to specific issues or areas if the parenting coordinator is being appointed pursuant to agreement of the parties." *Id.* § 120.3(D). Thus, Oklahoma statutes define a parenting coordinator's role as "resolving issues and deciding disputes," making clear that such role is functionally comparable to that of a judicial officer.

The specific Appointment Order in the Domestic Case provides that "appointment of a

Parenting Coordinator is necessary to assist the parents in implementing the terms of the existing child custody and parenting time order for the [following] specific issues . . . (1) Time-sharing (2) Expense allocation (3) The children's health-related matters (4) Decision-making (5) Transportation (6) Children's activities." (Appointment Order ¶¶ 2-5.) McGowen's "primary role" as Parenting Coordinator is "to assist the parties in working out disagreements about the child/ren in a way that minimizes conflict" and to "resolve/decide any issue as set forth in paragraph 5 within the scope of his[] authority by any appropriate dispute-resolution method." (*Id.* ¶ 6.) McGowen is also authorized to make recommendations that Father and Mother participate in various types of "interventions," such as therapy or treatment programs. (*Id.*) Any resolution, decision, or recommendation by McGowen must be submitted to the judicial officer presiding over the Domestic Case in a formal report within twenty days of the decision. After an objection period, the court may adopt such decision as an order of the court or set the matter for hearing. (*Id.* ¶ 10.) These specific duties listed in the Appointment Order, which require McGowen to act as a direct arm of the court by resolving disputes in the first instance, indicate that McGowen's role is functionally comparable to that of a judge. Lest there be any confusion, the Appointment Order labels McGowen as a "quasi-judicial officer" who has immunity consistent with Oklahoma law "as to all actions undertaken pursuant to the Court appointment and this Order." (*Id.* ¶ 13.)

As to the relevant factors listed in the Second Circuit's *Mitchell* decision, the Court finds that a parenting coordinator under Oklahoma law (1) must be able to perform his function without harassment or intimidation; (2) is subject to safeguards – *e.g.*, court supervision and review – that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (3) must be insulated from political influence in order to impartially complete his duties of mediating

between custodial parents; (4) must attempt to abide by precedent and follow the domestic law of Oklahoma; and (5) is involved in a highly adversarial process – resolving disputes between divorced parents regarding their children. *See Mitchell*, 377 F.2d at 172-73 (applying same factors but concluding that a state court screening committee's role was not functionally comparable to that of a judge because, *inter alia*, there was no available avenue for judicial review of committee's decisions). Accordingly, Oklahoma statutes creating the position of parenting coordinator, the specific Appointment Order at issue, and factors enumerated in federal law all indicate that McGowen's role is functionally comparable to that of a judge.

The Court also concludes that McGowen is entitled to quasi-judicial absolute immunity because his allegedly wrongful actions, *i.e.*, using and disclosing the intercepted communications, were "integrally related to an ongoing judicial proceeding." *See Mitchell*, 377 F.3d at 172. Father's principal evidence that McGowen used and/or disclosed the intercepted recordings is the 6/5/06 Letter. The 6/5/06 Letter was a response to Father's request that McGowen withdraw as Parenting Coordinator. It was addressed to counsel for Mother and Father in the Domestic Case, and Mother and Father were "cced" on the letter. In the letter, McGowen stated:

> Both boys individually and independently reiterated their same complaints as reported previously by them. *The phone conversations between their father and themselves only further validated their feeling of being pressured by their father.* This was not new information. Their father had previously brought the boys to be interviewed by me on January 16, 2005. Their mother exercised this request for me to interview them independently as well. Certainly the father has been aware since the outset that this previously exercised prerogative by him was always an option.

(6/5/06 Letter, Ex. 2 to McGowen's Mot. to Dismiss.) McGowen admits, consistent with this letter, that Mother did show him a written summary of the intercepted recordings and that he was therefore familiar with their content.

-12-

Assuming, for purposes of this motion only, that McGowen's actions violated Title III, any wrongful uses or disclosures were "integrally related" to the Domestic Case. Several attributes of the 6/5/06 Letter make this clear: (1) it references the case number in the Domestic Case; (2) it is a response to a request to withdraw by Father, which is a process specifically referenced in the Appointment Order; (3) it states that "as a licensed mental health professional serving in this Court Ordered position and in my capacity as P/C there are fundamental ethical considerations relative to withdrawing services when one parent is adamant that I not abandon;" and (4) it reminds all parties that "[w]hether my opinions and recommendations are modified by the information and input from [Father] is subject to this evaluative process and can only be sanctioned by the Court." (*Id.*) These references convince the Court that any potentially illegal use of the intercepted communications – *i.e.*, use and/or disclosure of the contents of the intercepted communication to the parties, to their counsel, or to clinicians involved with the Domestic Case  – were integrally related to McGowen's role as Parenting Coordinator. *See Myers v. Morris*, 810 F.2d 1437, 1466-67 (8th Cir. 1985) (holding that appointed guardians, therapists, and attorney had absolute immunity for claims arising from the function of questioning children because such questioning was "encompassed within the delegated functions" and was "necessary to perform the functions of determining the children's needs"), *overr'd on other grounds by Burns v. Reed*, 500 U.S. 478 (1991); *Ward*, 691 F. Supp. at 239-40 (holding that court-appointed guardian ad litem's actions of investigating reported child abuse was within the scope of her court appointment and she was therefore entitled to absolute quasi-judicial immunity).

As stated above, however, absolute immunity cannot attach to a quasi-judicial officer if his actions are "clearly and completely outside the scope of [his] jurisdiction." *Demoran*, 781 F.2d at

158 (9th Cir. 1986); *see also Turney v. O'Toole*, 898 F.2d 1470, 1474 (10th Cir. 1990) (stating that "absolute immunity extend[s] only to acts prescribed by [the court's] order in case addressing the immunity afforded to an official charged with executing a facially valid court order"); *Doe v. Hennepin County*, 623 F. Supp. 982, 986 (D. Minn. 1985) ("Court-appointed therapists are entitled to absolute immunity for acts committed *within the scope of their appointments.*") (emphasis added). Father argues that, even if parenting coordinators appointed pursuant to Oklahoma law are functionally comparable to a judge and even if McGowen's alleged illegal actions were, on their face, integrally related to the ongoing Domestic Case, McGowen does not enjoy immunity because "Mr. McGowen's role as an objective third party changed when he became an advocate for Ms. Jones." (Pl.'s Resp. to McGowen's Mot. to Dismiss 9.)  Father contends that "McGowen actively began excluding [Father] from the process of helping the parties work through issues" and that "[i]t was during this time that [McGowen] was involved with [Mother and Stepfather] in, at the very least, utilizing the illegally recorded phone conversations in supporting Ms. Jones' position." (*Id.* 10.)

Upon initial review of the evidence presented at the motion to dismiss stage, the Court had concerns as to whether, during the time period of the alleged wrongful actions, McGowen exceeded the scope of the Appointment Order by acting as Mother's advocate rather than a neutral third party. These concerns were based in part on statements made by counsel and Judge Bitting during a custody hearing held April 12, 2006 ("Custody Hearing") in the Domestic Case.  During the Custody Hearing, Mother attempted to call McGowen as an expert witness.  Counsel for Father in the Domestic Case, Brad Gundy ("Gundy") objected, arguing that McGowen had not met with Father regarding the pertinent issues, had not issued proper reports pursuant to the Appointment Order, and

had ceased to function as a parenting coordinator.  Specifically, Gundy argued:

> Because if he was acting in his role as parenting coordinator, we would have an exhibit here in court today that says yeah, I've done what I'm supposed to do, I've issued my report, it – somebody objected or didn't object to it.  And we would be in court if we needed to be if he was doing his job of a parenting coordinator.  Which brings me to a similar point.  And that is, he's not here as a parenting coordinator.  He's here to render a one-sided evaluation, number one.  And number two, to utter hearsay statements made by people, i.e., kids, who your Honor is going to talk to anyway. . . . But what's outrageous?  Well, you know, it's pretty outrageous that all this work was done and no formal report was issued by the parenting coordinator.  That this goes back over six, almost seven weeks ago and went on to last Friday.  You know, where is that parenting coordinator report?  There isn't one.

(4/12/06 Tr. 105-06, Ex. D to Pl.'s Resp. to McGowen's Mot. to Dismiss.)  After allowing argument from Eagleton, Judge Bitting stated that she was "leaning" toward excusing McGowen as a witness based on his failure to issue written recommendations.  (*Id.* 120.)  Judge Bitting stated that she was "wrestling with [] the provision of Title 43 Section 120.3 [] that the parent coordinator can assist the parties in resolving issues and decide disputed issues" and that her "concern [was that she did not] know how you can determine there is a disputed issue without talking to all involved."  (*Id.* 117.) Ultimately, Eagleton withdrew McGowen as a witness, and there was no need for a formal ruling. Thus, Father presented at least some evidence at the motion to dismiss stage that, although McGowen's alleged use of the recordings seemed to be in furtherance of his role as Parenting Coordinator, this was deceptive because McGowen had not followed certain procedures set forth in the Appointment Order.

Discovery has now concluded, and the scope of appointment issue is ripe for summary adjudication.  First, the Court finds that Gundy and Judge Bitting's statements at the 4/12/06 Custody Hearing, standing alone, do not evidence that McGowen was beyond the scope of his appointment in taking the allegedly illegal actions.  Neither during the Custody Hearing nor at any

time thereafter did Judge Bitting remove McGowen as Parenting Coordinator.  Nor did she state that

McGowen had acted improperly or exceeded the scope of the Appointment Order.  She merely

indicated it was not proper for him to testify as a witness as to any issues if certain procedures had

not been followed.  In light of these facts, neither Father's argument nor Judge Bitting's statements

at the 4/12/06 Custody Hearing demonstrate that, at the time of drafting the 6/5/06 Letter, McGowen

was acting with ulterior motives, was acting as Mother's advocate rather than as a Parenting

Coordinator, or was otherwise acting outside the bounds of his parenting coordinator duties.

Further, McGowen has not presented any other evidence that would support his theory that

McGowen morphed out of his role as Parenting Coordinator and into the role of advocate for

Mother.  During his deposition in this case, Father testified that he believed McGowen acted outside

the scope of his appointment simply because McGowen (1) listened to the tapes, (2) had

communications with Mother without Father present, and (3) was called by Mother as a witness at

the Custody Hearing.  In this regard, Father testified:

> A:   Well, one, [McGowen] listened to the tapes that [Mother] brought of him of
> conversations.   I don't think that's within the scope of a parenting
> coordinator.  Two, he – I mean, it went – I can't remember what the exact
> amount of time was, but he carried on having meetings with her and I was no
> part of the process that was going on.  I mean, those were the two that come
> to my mind.
>
> ***
>
> Q:   Your reasons, then, are his appearances at that hearing, you say that he
> listened to tapes and that he had meetings with the mother of the children that
> you weren't a part of?
>
> A:   Correct.

(Babb Dep. 42:7-43:2, Ex. 2 to McGowen's Supp. Br.)  However, none of these facts tend to show

that McGowen was acting outside the scope of his appointment.  With respect to McGowen's receipt

of or listening to the tapes, it is not disputed that the tapes and/or a summary thereof were given to McGowen by Mother and/or Stepfather for McGowen's review.  Father has no evidence that McGowen encouraged Mother to make the recordings or took any other actions tending to show that McGowen was acting as Mother's "advocate," rather than a neutral arm of the Court, in reviewing the contents of the tapes.  Nor does Father have any evidence that McGowen "used" the recordings for any purposes outside the scope of his role as Parenting Coordinator.  As explained above, the 6/5/06 Letter was clearly written in McGowen's role as Parenting Coordinator because it was a response to Father's request to withdraw form such a position.  With respect to meeting with Mother outside the presence of Father, such *ex parte* meetings are expressly authorized by the Appointment Order.  (*See* Appointment Order ¶¶ 8A-8C; 9A-B.)

In sum, Father has failed to present evidence of a single incident or a pattern of behavior by McGowen showing that, in viewing a summary and/or listening to the recordings and then referencing the recordings in the 6/5/06 Letter, McGowen acted outside the bounds of the Appointment Order.  Instead, even assuming such actions violated Title III, McGowen acted at all times within the scope of his appointment as a Parenting Coordinator and is therefore immune from Title III liability.  *See Demoran*, 781 F.2d at 158 ("Absolute immunity fails to attach to judicial officers only when they act *clearly and completely* outside the scope of their jurisdiction.") (emphasis added); *Hennepin County*, 623 F. Supp. at 986 (holding that plaintiffs had not asserted facts showing that court-appointed psychologist exceeded scope of judge's appointment order or any facts tending to show that psychologist "was not functioning as a psychologist at all relevant times").  Accordingly, McGowen is shielded from Title III liability based on the doctrine of quasi-judicial immunity.

## IV.   Eagleton and Law Firm's Motion for Summary Judgment

Father seeks to hold Eagleton and Law Firm liable for violations of 18 U.S.C. § 2511(1)(c) and (d), which permit a civil action against any person who "intentionally discloses, or endeavors to disclose, to any other person" or "intentionally uses, or endeavors to use" "the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." 18 U.S.C. § 2511(1)(c) and (d); *see also Peavy v. Harman*, 37 F. Supp. 2d 495, 510 (N.D. Tex. 1999) (explaining that "Title III . . . create[s] a tort-like remedy for the violation of a criminal statute."). "Disclosure" and "use" are distinct concepts under Title III, although the same conduct can violate both provisions. *See Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 175 (5th Cir. 2000) (explaining distinctions between "use" and "disclosure" for purposes of Title III liability); *Fultz v. Gilliam*, 942 F.2d 396, 400 n.24 (6th Cir. 1991) (explaining that "Congress intended to distinguish between disclosures and other uses that do not involve actual disclosures") (providing examples of "uses" as threats to divulge contents of recordings in order to coerce money and oral recitation of contents of recordings). With respect to the "knowingly" requirement, in order to be liable for violations of 18 U.S.C. § 2511(1)(c) or (d), a defendant "must know 1) the information used or disclosed came from an intercepted communication, and (2) sufficient facts concerning the circumstances of the interception such that the defendant could, with presumed knowledge of the law, determine that the interception was prohibited in light of Title III." *Thompson v. Dulaney*, 970 F.2d 744, 749 (10th Cir. 1992).[6]

---

[6]   This is a greater degree of knowledge than that required to establish a violation of 18 U.S.C. § 2511(1)(a) or (b), which prohibit intercepting or procuring another to intercept certain communications. *See id.*

In this case, Father alleges that Eagleton "used" and/or "disclosed" the contents of the intercepted communications in open court during the 4/12/06 Custody Hearing.  In one of the recorded conversations, Father asked one of the Minor Children to borrow twenty dollars.  (*See* Transcription of Recorded Messages, Ex. 2 to Eagleton's Mot. for Summ. J., at 41-42.)  Eagleton allegedly used and disclosed this information during the Custody Hearing when she asked Father the following:

> Q:     Okay.  Let's move on.  Mr. Babb, do you borrow money from your children?
> A:     No.
> Q:     Ever?
> A:     Not really.
> Q:     Do you ask the children if they have money?
> A:     No.
> Q:     And ask if you can borrow it.
> A:     There's been a few times, yes.
> Q:     And could you tell me when those times are?
> A:     I couldn't even tell you the times.  I mean, there's been times that maybe –
>        I can't even remember times when they've had money and I said hey, I get
>        paid tomorrow, can you spot me twenty bucks and I'll give it back to you.

(4/12/06 Custody Hearing Tr. 41-42.)  Father speculates that Eagleton must have based these questions on information gleaned from the recordings.  Eagleton asserts that she did not know about the recordings or their contents until after the Custody Hearing and therefore could not have "used" and "disclosed" the contents of the tapes in the alleged manner.  Eagleton contends that she learned this information from Mother, who was told directly by the Minor Child that Father had asked to borrow money.  Thus, Eagleton's primary argument in her motion for summary judgment is that Father has not created a genuine question of fact as to whether Eagleton "knowingly" violated Title III.[7]

---

[7]     Eagleton and Law Firm made several other arguments in support of their motion for summary judgment, including that Mother and Stepfather's interception was not itself illegal and

The Court concludes that Father has not presented evidence creating a genuine question of fact as to the "knowledge" requirement. Father's only evidence that Eagleton had direct knowledge or had been informed of the contents of the illegal recordings at the time of the Custody Hearing is Father's speculation that she must have known about the illegal recordings in order to formulate her questions. (*See* Pl.'s Resp. to Eagleton's Mot. for Summ. J. at Fact No. 14.)  Such speculation, however, is directly contrary to all other record evidence.  Eagleton denied knowing about the tapes or their contents at the time of the Custody Hearing; Mother denied disclosing the existence or contents of the tapes to Eagleton prior to the Custody Hearing; and Stepfather denied disclosing the existence or contents of the tapes to Eagleton prior to the Custody Hearing.  Although Mother had informed Eagleton, prior to the Custody Hearing, that Father routinely borrowed money from Minor Children, Mother did not inform Eagleton or even imply that such information was derived from intercepted recordings.  In fact, Mother and Eagleton contend that they knew about Father's propensity to borrow money based on statements made by Minor Children and that similar instances of borrowing money had occurred prior to the recorded instance.  Even assuming, however, that the original source of information was the intercepted communication rather than Minor Children, there is still no record evidence tending to show that Eagleton knew or had any reason to know Mother derived this knowledge from an intercepted call.  Further, Eagleton did not mention the tapes, play the tapes, or use the tapes to impeach McGowen during the Custody Hearing.  Although actual mention or use of the tapes is not required for a "use" or "disclosure" violation,[8] it would have

therefore no subsequent use and disclosure by Eagleton was illegal.  The Court does not reach these arguments in disposing of Eagleton and Law Firm's motion for summary judgment.

[8]   *See, e.g., Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 175 (5th Cir. 2000) (holding that news station could be subject to "disclosure" violation for disclosing contents of recorded

assisted Father in raising an inference that Attorney had knowledge of the recordings at the time of the alleged use.

In sum, Father simply does not have sufficient evidence to raise an inference or create a triable question of fact as to whether Eagleton knew the information regarding the borrowing of money came from an intercepted communication, or as to whether Eagleton was aware of the circumstances of the interception such that she could determine that the interception was prohibited in light of Title III.  *See Dulaney*, 970 F.2d at 749.  For the same reasons, the Court rejects Father's similar allegation that Eagleton "used" the recorded conversations to prepare McGowen for his testimony prior to the Custody Hearing.  Accordingly, Eagleton and Law Firm are entitled to judgment as a matter of law.[9]

_____

conversation and "use" violation for using intercepted communications to obtain independent sources for the intercepted information); *Bess v. Bess*, 929 F.2d 1332, 1334 (8th Cir. 1991) (holding that husband's recitation of facts obtained from intercepted communications during divorce proceeding supported jury's finding of "disclosure" violation); *Leach v. Byram*, 68 F. Supp. 2d 1072, 1075 (D. Minn. 1999) (holding that lawyer "used" contents of recorded conversation by sending letter to opposing counsel referencing contents of taped conversations and threatening to use them for impeachment at trial).

[9]     Father's only allegations of  "use" or "disclosure" by Eagleton relate to actions occurring prior to or during the Custody Hearing.  Therefore, the Court need not reach the question of whether Eagleton's listening to the tapes after the Custody Hearing for purposes of compliance with the subpoena from Gundy constitutes "use" of the tapes.  The Court notes that there is a split among district courts in the Tenth Circuit as to whether merely listening to tapes, without more, can constitute "use" for purposes of Title III liability.  *Compare Thompson v. Dulaney*, 838 F. Supp. 1535, 1547 (D. Utah 1993) (holding that listening to a tape constitutes "use" and stating that it "strains logic to conclude that reading a document or listening to a tape does not amount to 'use' of those items"), *with Fields v. Atchison, Topeka, and Santa Fe Rwy. Co.*, 985 F. Supp. 1308, 1313-14  (D. Kan. 1997) (disagreeing with *Thompson* court and holding that merely listening to a tape does not amount to "use" because "use" is an active word that means "'to put into action or service'"), *vacated in other respects by Fields v. Atchison, Topeka, and Santa Fe Rwy. Co.*, 5 F. Supp. 2d 1160 (D. Kan. 1998).  In this case, the fact that Eagleton received and reviewed the tapes solely for the purpose of compliance with Gundy's subpoena would seem to counsel against a finding of use.  *Cf. Philadelphia Housing Auth. v. Am. Radiator*

V.      **Conclusion**

For the reasons explained above, the Motion to Dismiss of Defendant Charles McGowen (Doc. 25), which the Court converted to a motion for summary judgment, is GRANTED; and the Motion for Summary Judgment of Defendants Norma Eagleton and Eagleton, Eagleton, & Harrison, Inc. (Doc. 72) is GRANTED.  The Court will proceed to trial on Father's claims against Mother and Stepfather.

The remaining parties are directed to include in their trial briefs, in addition to any topics they deem relevant, a discussion of the effect of a joint custody agreement on a custodial parent's ability to provide vicarious consent on behalf of a minor child.  The parties are further directed to submit, in addition to any other instructions they deem relevant, proposed jury instructions on the following topics:  (1) Elements of Extension Phone Exemption; (2) Definition of "Ordinary Course of Business" for purpose of Extension Phone Exemption; (3) Elements of Consent Exception; and

---

*& Std. Sanitary Corp.*, 291 F. Supp. 247, 250 (E.D. Pa. 1968) (holding that attorney did not violate Title III by reviewing tapes and producing them pursuant to court order because the attorney did not act "willfully" in reviewing and producing tapes).

(4) Impact of Joint Custody Agreement on Consent Exception.  These proposed instructions should include citations to relevant authority.[10]

IT IS SO ORDERED this 18th day of June, 2008.

**TERENCE  KERN**
**UNITED STATES DISTRICT JUDGE**

---

[10]    To the extent the parties object to any such instructions being given, the parties will be allowed to make a record of such objection.  However, at this time, the Court intends to give these or similar instructions and orders the parties to provide proposals.

-23-